The first case on our call this morning is Agenda Number 9, Case Number 104-935, Joanna Abruzzo v. City of Park Ridge. Ms. Schwartz, are you ready to proceed? Good morning. My name is Susan Schwartz and I have the privilege of representing Joanna Abruzzo as the Independent Administrator of the estate of her son, Joseph Ferriero. As this Court is aware by now, this case arises out of a call for 911 emergency services to treat an unresponsive 15-year-old boy who had required CPR. The call was placed by his father using the nationally recognized 911 number and an ambulance and paramedics was dispatched by the City of Park Ridge. After these emergency care providers arrived at the Ferriero home, they left without providing any medical care whatsoever to this 15-year-old boy. When suit was filed... Could I just get some facts? Sure. You said they provided no service. Did they go in? Unfortunately, Your Honor, that is unknown to us. We have the curious predicament that before suit was filed, there was discovery under a Bill of Discovery to attempt to obtain all of the relevant documents from the Fire Department. For this particular run, there is no run sheet. As you may or may not be aware, a run sheet is prepared to indicate what was done. In a perfect world, we would have that run sheet. Any conversation with the father? Because I understand he had given CPR before they arrived. Well, that we know from the dispatch tape, which was also provided to us and made available in pre-suit discovery. Unfortunately, this not being a perfect world, I represent the mother, the divorced mother, who was not present in the home that evening and whose husband is not necessarily helpful or cooperative with me. As this case is filed on the pleadings only, unlike many of the other cases that have discussed some of these immunities, we do not have depositions and statements and other information to flesh out certain material. So we don't know whether the father sent them away and said that he's okay? We have nothing to indicate that one way or the other. I know that this is on a motion to dismiss and in fact, I'm not supposed to matter. My interest is whether or not this may fall under the American National Bank case where nothing was done. Well, that based on the pleadings that are before this court and all that we have available to us and certainly all that was available to the reviewing health care provider who assumes the call was made, the facts are as stated, and that's what's on the dispatch tape. My son is not breathing, unresponsive, I'm providing CPR, please come, I need help. And that is the key component here because the Emergency Medical Systems Service Act, the EMS Act, was devised and implemented by our legislature to provide a means for the act. What it says is that pre-hospital care, and again, this is defined in 210 ILCS 50-310, the scope of services, that pre-hospital care emergency medical services rendered to an emergency patient are for analytic, resuscitative, stabilizing, or preventive purposes preceding to or during transport. And the services that are enunciated in Sections A through C above that are ALS, which is advanced life support, ILS, which is intermediate life support, and BLS, which is basic life support. And those life support activities, which are very clearly defined, are care that according to the scope of services in the act of itself is care that shall, not may, not perhaps, it's care that shall be initiated as authorized by the EMS director, and it's all according to the system plan. And I think that this is important because the role of the care provider who comes in an emergency situation is not the same as the role of perhaps other health care providers. Their role is not to make a definitive diagnosis and to determine what the problem is. When they see the unresponsive person lying unconscious, it's not their role to determine that that person has a ruptured abdominal aortic aneurysm that caused that, or that person has a pulmonary embolism that is responsible for what they're seeing. Their role is to provide this pre-hospital care to analyze, resuscitate, and stabilize so that the patient can be transported to a hospital where the definitive care that the patient requires will be provided. Again, part of the problem that the appellate court had in this case was looking at these emergency care providers as part of the universe of health care providers. And they were of the opinion that if this court had been presented with this dichotomy between the immunity that's afforded, the absolute immunity that's found in the Tort Immunity Act, or the limited immunity which the plaintiff is maintaining applies in this case under the Emergency Services Act, using the reasoning in the Heinrich case, looking at the school code, this court would have determined that in this particular sphere, they were vying for the same sphere and there would be no problem in applying the Tort Immunity Act. But I think I had trouble with these spheres, and perhaps I can try and describe what my issue was. I kept thinking of Venn diagrams, that you've got circles. Does that mean they never intersect, or that they are always disparate? Well, that doesn't make sense under the decision of this court in Moore v. Green, because then we were looking at police officers who were doing verified police work, but in a very specified circumstance under the Domestic Violence Act. Here, we're dealing with a very, very small group of health care providers. These emergency service health care providers who provide care under limited circumstances. Counsel, if I may. Sure. Under, in Moore, I think, recognized that the Act created a duty. And I don't, and I'd ask you, does the EMS Act create a duty? I am suggesting, Your Honor, that it does, for two reasons. One, in developing this system to provide basic emergency services to all of the Illinois citizens, there has to be developed by the emergency system director an EMS plan. That plan has to include standing medical orders and standing operating procedures. Also, as I was discussing with you under the scope of services to be provided, it specifically states that pre-hospital care for emergency medical services to stabilize and resuscitate includes these ALS, ILS, and BLS services, particularly when it states that advanced life support means pre-hospital emergency care and medical services that includes basic life support, cardiac monitoring, cardiac defibrillation, electrocardiography, intravenous therapy, administration of medication and drugs, and other techniques and procedures as outlined in advanced life support national curriculum provided by the United States Department of Transportation. And that care shall be initiated as outlined by the EMS medical director. Obviously, this Act could not list what a healthcare, a paramedic or that's not contained within the legislation itself, but it refers to that these individuals are going to be trained by this core curriculum, which is a voluminous document, which will set forth what these standard operating procedures are that they're to use when they encounter these situations. Is it your position in response to Justice Fitzgerald's question that the duty is created by the Act but then defined by common law? Is that your position? Well, no. Well, okay. It's created in that they must be licensed and equipped and able to follow these procedures, that the emergency medical director has to ensure that persons who are operating in our emergency medical system are capable of providing and delivering the required emergency care. And they are, I mean, they have to be licensed. Their license requires that they be certified under these national curriculum and then that they follow operating procedures that are put into effect that the emergency medical director is required to provide for all of the participants in the regional medical plan set forth these specifics. And there are many, many cases in the appellate court which discuss the specificity of these standing medical orders and standard operating procedures. And if I would just point to one of them, the Bowden case, it talks about what to do when an unconscious person was found. The first thing they do is do a survey to check airway, breathing, circulation. The second thing is 30 seconds later to check the vital signs, monitor the cardiac rhythm, start an IV. I mean, these standard operating procedures are very, very specific to deal with particular problems, but they would not by essence be placed into the statute itself. But I believe that that is the duty to comply with the training and the licensure and the training. That having been the duty, within this very, very small, and again, I think we need to think of the whole universe of healthcare that is out there to which the Tort Immunity Act provisions provide. You have emergency service providers, then you have hospitals to which the patients are admitted, so now it's outside of the realm of emergency services. You have every doctor that a patient goes to an office. You have every outpatient physical therapy. I mean, this whole universe of healthcare is much wider than this very, very small, segregated set of concern that the legislature, in enacting a minimum set of requirements for emergency services. I'm not sure I understand. Okay. But let me ask a question. Sure. If this connected spheres, in fact, creates a duty, would it create duties for other than emergency medical service people? Would it create duties for doctors? No. Or nurses? I think that that's, perhaps I misspoke and wasn't making myself clear. I'm saying that the duties that are in the Emergency Medical Systems Act apply only to this very small sphere of healthcare providers. These ENTs And you're saying that comes from the Act? That comes from the Act, yes. There's something about the Act that creates a duty. Is there some language in the Act that creates a duty? Well, saying out that they have a duty, other than saying that they shall initiate Something you can point to that indicates Creation of a duty. Saying that they have a duty to do this, no. But what I am saying is that under the scope of medical services, which is in the Act, which is Section 310 of the Act, in Sections A, B, and C, when they set out what ALS, ILS, and BLS care is, that it is stated that this care shall be initiated as authorized. And again, all of the care is being provided in conjunction with the system plan, which the medical director is required to put into effect that's to be followed by all the people that are participating in this emergency medical service provision. Other than that, I mean, no, can I sit to you and say that there's something No. I'm trying to describe where, I mean, I believe the duty arises, and that's where I think we look to, that they can't enunciate everything that will be done by a care provider when they find an it is assumed that they will provide the stabilizing support necessary. Is it any part of it whether or not the emergency person does in fact do something or does nothing? Does that make any distinction at all? Well, again, when saying that they shall initiate ALS and do, I mean, but, again, it's almost unfathomable to think that an emergency care provider, these very special people that are trained and respond to these systems would do nothing. But we know it happens. That's why there was the issue in the TriUPRI case, the American National Bank case, where they were never able to render the emergency care because the patient was never located, even though there were in effect procedures for which the deliverers of emergency care were trained nationally and locally to instruct them to how to locate the patient. The patient said you have to try the door to see if it's open to see if it's unlocked. That was the issue in the American National Bank. In even the Moore case, the police officers were called and came, but they never entered the house. They left. So as unfathomable as it may be to us that these public servants whom are paid, hired, and retained to do these things, we believe that they will do it. Sometimes they don't. And, again, that's unfortunately in this case a problem that nothing happened. But that's what the act was put in place to avoid is because these care providers have to act, and time counts. Minutes are important. So I think that these standard operating procedures are developed, and why they're there is so that they will follow these protocols to stabilize the patient so that they can get them to the hospital where the definitive care will be rendered. They're not making a diagnosis, as another person would. They are following and responding to a medical condition. In talking about protocols. Yes. Wasn't there a physician's report attached to the complaint? Yes, there was. Indicating that the father refused treatment or transportation to the hospital. No. What that physician's report says is that one of the reasons he says there was no signed refusal of treatment. Medical care providers who help us out in these cases always try to help. So one of the suggestions was in consulting with him was if they don't have a run sheet, do they have a refusal? That was another one of the things that we asked for in discovering there was none there. So, again, he was just speculating about possible things. There is nothing in any of the factual material on the dispatch tape or any of the records to indicate that the father did indeed refuse treatment. It was, however, my consultant whom I hired and retained to help in this case and to file the requisite certificate of merit stated wasn't there. It's also another thing that the explanation for why it's not there, why the run sheet aren't there, has never been pursued or developed in this case because we are here before this court on the basis of the pleadings only. Is this the same thing you've been telling us in response to the duty, Ms. Schwartz, on page 6 of your reply brief? The enunciation of the limited immunity for an emergency care provider in the EMS Act does not define the duty of a paramedic. The duty of a paramedic arises from the common law. Well, yes, I do think the duty arises for any paramedic from the common law, as it would for any physician. But in addition to that duty, as a licensed paramedic as part of the emergency medical system who is trained in, well, a paramedic would be trained in advanced life support. An EMT based on their level would be either trained in, well, most of them are intermediate life support, some basic life support, a first responder basic life support, that according to the scope of services under the Act, they are required and shall institute treatment in accordance with the level of their licensure. So I'm looking to provide perhaps a statutory duty, but I think that the duty is always there in the common law for any health care provider to do what another reasonably well-qualified health care provider trained as they are would do under the same or similar circumstances. Again, your perfect world is one I wish we lived in. As do I. But wouldn't that argument put all medical personnel in the same way as whether or not there was a duty? I mean, you wouldn't, on the common law, if we look to the common law, we'd look to the common law that it applies to all medical personnel, not just emergency folks. Well, all right. I guess sometimes where the problem lies in, at the common law there is a duty. Then there are some statutory duties that apply in addition to that. Under the Tort Immunity Act, which is the immunity we're looking at, that doesn't create any duties. It just removes responsibility for liability that would otherwise exist. There may have been, and that immunity would apply to somebody who might have a common law duty, wouldn't it? Yes, it would. And I'm saying that that has been applied through the case law to health care providers in the hospital and private office setting under a variety of circumstances. But in all of those cases, as I pointed out, there's not one case where the health care provider did nothing. In every case, they at least looked at the patient and made a diagnosis, even if it were incorrect. And that's the other thing about the special nature of a diagnosis in these cases, because what they're being called to treat is a condition, a medical condition that a layperson with average knowledge of medicine would realize was something that required abrupt, severe, sudden, unscheduled emergency treatment. That's the definition of emergency in the Emergency Systems Act. So that type of thing that can be recognized by a layperson to force them to call for help and for assistance to be rendered is the condition that the emergency medical system care providers are called to treat and to which they are to treat in accordance with their licensure and the treatment plan that's been developed by the emergency services director. I understand, Ms. Schwartz, in answer to Justice Freeman's questions, that it's a little cloudy as to the facts because of some of the problems that you've indicated. I wish that I could tell you more, but I'm not always presented with the case. Is there an understanding that they went in, said unresponsive, and walked out? Your Honor, for me to be able to tell you more from what I can discern on the tape, the tape ends pretty much with the arrival at the home. Because I'm hearing what the dispatcher has back at the 911 center in the conversation with them. And then we get the times from the dispatch logs of when the vehicles arrive at the house and when they leave because they're required to log in and log out because now they're available to go to another call. So we have nothing. We don't even know whether that duty, as you allege, is frustrated by them not even being allowed to come in, right? Well, we have nothing to suggest that they weren't allowed to come in, but I mean certainly a health care provider who is trained would use, as most physicians would, their best efforts to state that the call was made. This isn't something that they would check it out, that they would assess. And they can't even make the decision whether the patient needs to be resuscitated, stabilized, or transported unless there is in some way they look at the patient and attempt to make that rudimentary basic assessment of airway, breathing, circulation, which are what they're required to do under their protocols. May I ask a question? Sure. When did the duty arise? Did it arise when the call came into the 911 center? I believe that it did. That's the start of the EMS response, the placement of the 911 call. And the EMS Act is designed to regulate and provide minimum standards for the entire EMS response call. It includes everything to do with pre-hospital transport, including organization selection of which hospital patient we brought to and who actually will respond. And there are rules within the administrative code and the Act itself that govern the dispatcher. So the emergency medical response, as it's defined in the Act, is for all of these emergency medical care that is provided pre-hospital from the time of dispatch through the transport and the arrival at the hospital. Thank you. Thank you, Ms. Schwartz. Thank you. Mr. Cajoa. Thank you. Good morning, Your Honors. I'm Michael Cajoa on behalf of the City of Park Ridge, the defendant appellee in this case. The issue before the court today is when paramedics employed by a municipal entity respond to a 911 call for assistance but provide no emergency medical service of any kind allegedly resulting in injury, which immunity statute applies? One of two, the Tort Immunity Act, specifically 6105 and 6106, or the EMS Act, specifically 3.150 of the EMS Act. The City of Park Ridge asserts in this case that the decisions of both the trial court and the appellate court were correct and that the Tort Immunity Act applies in this particular case as these two provisions of the Tort Immunity Act provide absolute immunity to the allegations of willful and wanton conduct in plaintiff's First Amendment complaint. And when you look at those allegations in the First Amendment complaint, they are, in summary, a failure to evaluate, a failure to assess, a failure to initiate any sort of treatment, a failure to document what happened, and a failure to transport. Those fall directly in line with 6105 and 6106 of the Tort Immunity Act. In addition, at the trial court level, the proposed amendments to the First Amendment complaint did not cure that defect. They still pled directly into the provisions of 6105 and 6106 because they were, again, about a failure to perform any emergency medical service of any kind. And that is the fact pattern that we have in this particular case. So really the threshold question, I think, that needs to be answered today is, do both of these statutes, the Tort Immunity Act and the EMS Act, apply to the allegations of the First Amendment complaint? And the answer to that is no, they do not. The Tort Immunity Act, as I said, 6105 and 6106, does apply. It's directly on point to the allegations in the complaint. But the EMS Act, 3.150, does not apply to the allegations in this case. Now, I don't believe there's any dispute about the validity and applicability of 6105 and 6106 to what we are faced with here. 6105 provides absolute immunity to local public entities and public employees who are within their scope of employment for any injury caused by either a failure to make a physical or mental examination or a failure to make an adequate physical or mental examination. And that is exactly what is alleged in the complaint, that we failed to make any physical or mental examination at all. And then 6106 provides absolute immunity to local public entities and public employees who are within the scope of their employment when an injury is caused by either a failure to diagnose a physical or mental injury, a diagnosis of a physical or mental injury, or failure to prescribe for that physical or mental injury or illness. And once again, when you look at the allegations of the complaint, even the proposed amendments to the complaint, 6105 and 6106 are directly on point. Mr. Kujawa, then why do we have the EMS Act? Well, I believe the EMS Act, by its very terms, applies once emergency medical services are provided. If you look at... Well, aren't they the first responders? They are the first responders. And aren't they to take the patient to the medical providers? Well, I think the first thing that needs to happen in any one of these scenarios is you have to find a patient who wants care, needs care, requires care. What about an unconscious patient? Well, if you have an unconscious patient and you begin to do something, once you begin treatment, I think that's the distinction between the two statutes. With the Tort Immunity Act, we're talking about pre-treatment, pre-contact immunity. Once you begin to provide treatment, then your immunity that's under the Tort Immunity Act, they're gone. Now you're under the provisions of the Emergency Services Act. Well, nobody's providing any pre-treatment unless the EMS person is there. I would agree. And under the facts of this case... So if you just look at the Tort Immunity Act, doesn't it say under 3.10a to c, that the care shall be initiated as authorized, which provide an emergency support system? I think what they're saying here, and I think you have to read 3.10, the Scope of Services section of the EMS Act, in conjunction with 3.150, the immunity provision, because the immunity provision talks about any actor. It could be a private actor, it could be a governmental actor, but any actor who in good faith provides emergency or non-emergency medical services. Then what about the EMS actor? The EMS actor, if they begin to provide, what 3.10 talks about is the Scope of Services. Do they have a responsibility to provide because it says shall? Do they make the decision? Actually, I think if we read it in whole, what it says is that care, whatever care it's decided upon to be given, whether it's advanced life support, intermediate life support, basic life support, or any of these, underneath it says that care shall be initiated, but it's got to be authorized by someone else. They're not acting on their own decisions out there. It says it shall be initiated as authorized under the written or verbal direction of a physician. And that's just underneath the 3.10, under 3.10a, it's under 3.10b. But the medical director or physician isn't present. No, but before that actual treatment is provided, before they start putting medication into a patient on scene, poor paramedics or EMTs are going to do that. They're going to contact the hospital or the emergency service provider where they're going to bring the patient, and they're going to get authorization. It says right in here they shall be initiated as authorized under the written or verbal direction of a physician, licensed to practice medicine in all of its branches, or under the verbal direction of an emergency communications registered nurse. That's when the paramedics start to communicate via radio or telephone, depending upon the situation, with the hospital or triage center or emergency services facility that they're going to be bringing this patient to. They don't just make those decisions on their own. So there is some level of discretion involved to what these paramedics are doing out there. That's why – Mr. Cajal, do you agree that a diagnosis would be the start of treatment? Yes, I do agree. You have to begin providing, doing something with a patient in order to reach a diagnosis, in order to decide what you're going to do. And I understand the appellate court ruled that unresponsive is not a diagnosis. I think they went through the dictionary definition or whatever. Sure. So – and I also understand, at least from Ms. Schwartz's argument, that we don't have all the facts here. But assuming that the paramedics came in and saw someone unresponsive, at that point, without doing more, if we agree with the appellate court that that's not a diagnosis, right, they walk out of the room, well, he's unresponsive. They have no duty to go – based on that finding, for lack of a better term, that someone is unresponsive, they have no duty to go further. Is that your position? My position would be that if they were to come into that scenario and find an unresponsive person here, if it is a governmental entity and they do not do anything, they are immunized by 6105 and 6106, by the plain language of the statute. They have not provided any examination. They have not provided any diagnosis. They have not provided any treatment whatsoever. Now, it's an almost impossible situation to imagine that a trained paramedic, someone who has tried and sought out and educated themselves to take this position, to be an EMT, they don't just hand them out, but you have to go and you have to seek out this position, that they would go somewhere and see an unresponsive person and fail to do anything. At some point you cross the line from duty under the law to morality, what your obligations to society are. But when we talk about the common law responsibilities of any individual, I think the EMS Act even refers to it when they talk about where their immunities come from, comes from the Good Samaritan law, which means that as a person walking down the street, you don't have to act. You don't have to do anything. The law is not going to place a duty upon you to do something. If you're going to do something, you need to do it correctly. And that's not far from what we're talking about with 6105 and 6106. If you're going to initiate treatment, if you're going to initiate some sort of medical care, you have to do it correctly. Mr. Cajal, though, under your scenario, it seems to me, then, why would anybody call 911? If the EMT shows up and just looks at a person and says they're unresponsive and walks out, that doesn't help in a situation like this. I would agree that it doesn't help. However, I think if we were to poll the citizenry, I can't imagine anyone would say, gosh, I'm not going to call 911 because of the possibility that the paramedics might arrive, see that whoever I'm calling for needs help, and just walk away. I don't think that is a realistic scenario. I don't think that that is something that happens ever. But we're only speculating in this case the reason why. Well, unfortunately, we have the record that we have in this case. Let me ask a question about that. When we have the record that we have, is our only option to conclude that the paramedics did nothing? Is that how we have to look at this case? No, I don't think you have to look at it as that they did nothing. I think you can read in, what we have in front of us is we have the complaint and we have the physician's note. And we also have, you can see what happened here. It's a tragic situation what happened to the boy in this case, but he did not die following the 106 a.m. paramedic response. There was a second call at 9 a.m., and at that time when the paramedics arrived, they did initiate emergency medical services. They provided, they initiated CPR, they attempted to resuscitate, they transported him to the hospital, and it was unfortunate, but he died. Counsel, if I may, how does that give us any insight to what happened early that morning? Well, I think you can infer that if they went at 9 a.m. to the same call of a nonresponsive person and provided emergency medical services, you can assume that they were required of the patient, needed and wanted by the patient. And if they didn't do it at 1 a.m., it's because they weren't required, needed or wanted by the patient. Additionally, when you look at the physician's report. It wasn't the same team, was it? It was not the same team, but it's the same fire department, same village employees, trained the same, working under the same guidelines through their department, and you can assume would be handled the same. I think if you look at the physician's report as well, what they talk about, and we're not supposed to guess and conjecture and speculate, but when you look at the physician's report, he says if medical treatment was refused, then a refusal sheet should have been signed, which to me seems to indicate that perhaps that's what happened. Where's the sheet? It's not in the record that we have before us. So you're asking us to presume, though, that it was signed? No, actually, I can tell you right now that there is no refusal sheet signed. Counsel, back to my original question. What are the facts that we have to base our decision on in this case? I think everybody in the room knows that something else had to happen that's not before us. And it's unfortunate as we stand here right now that we don't have that, and even the dispatch tape is not part of the record, although it sounds like from counsel's statements that it was relied upon by the doctor in this case. But what we have, really, is we have allegations and a complaint, which when read by the plain language of the statutes 6105 and 6106, those allegations clearly fall within the immunities that the legislature sought to establish for emergency medical services and for public entities and their employees under 6105 and 6106. And certainly, in many cases, the record is developed further before it ever gets to this position. But as defendants, we don't decide what gets put into the complaint or not. We respond to the allegations that are made against us. And when the allegations such as these are made against us, and they fall so clearly and so directly under the immunity provided, there really is no need to develop the record. So it is your position that no duty would arise in this instance until they began provision of services? I think that if there is any duty that would arise for a local public entity or a public employee in this scenario, that they would be immunized by 6105 and 6106. I don't necessarily believe that a duty arises just by an observation that they make. But regardless... That was my question. You're saying it doesn't arise until they provide some kind of service. I don't know where the duty is going to come from if it doesn't come by statute. When we go back to the common law, the public duty rule is that local public entities and municipalities, they don't owe a duty to one individual throughout the town or village or city, wherever. They owe a duty to the public as a whole. And that's why some of these immunities have been developed, because you can't hold police officers responsible for stopping every crime that happens out there. It's impossible. You can't regulate everything that happens. They do the best they can under difficult circumstances, and I don't believe the duty does arise. And if it does, it's a 6105 and 6106 immunities. Mr. Kajawa, and I understand, your position is basic. You understand that we have to take the facts of the well-pled facts as true, right? Your position is even with those well-pled facts that the immunity provisions apply. Absolutely. And this really isn't our province, but out of curiosity, let's look at one of the allegations. Responded to a request for emergency medical service for a patient in an altered mental status and failed to initiate advanced life support. Just that fact. Yes. You say that falls within the immunity. I'm not arguing one way or the other. And I said it's not our province, but give me a public policy argument why the legislature would contemplate, when it's a governmental agency, that if an EMT comes and sees somebody in altered mental state, they should just be able to walk away if they so desire. Well, I think when you talk about the Emergency Medical Services Act, the purpose of the act really is to try and regulate the initiation and development of these programs. It's not like the Domestic Violence Act, which lays out specific things that a police officer will do when confronted with a specific situation. The great majority of the EMS Act is about how you're going to develop and group together these various towns and communities and how it's all going to be regulated and all that. But there are remedies available to someone who calls for emergency services and doesn't get the emergency services that they think they should get, such as when they come and they do nothing for someone who needs help. Certainly that EMT or paramedic is going to be in danger of losing their job. There are processes within the EMS Act which talk about suspension or revocation of EMT or paramedic licensing, both for municipal entities and for private actors. So there are steps that can be taken to prevent that. But just as in a public policy setting, it is generally assumed that local public entities and their employees are going to do what they are sworn to do, that they're going to go and act. They're going to provide those services. When a paramedic arrives at the scene, I mean, I know of no other case. I agree with that. But, again, taking the allegations is true. Here she's saying it didn't happen, that they came in unresponsive. Sorry, I just don't feel like treating this one. And this is one specific instance based on facts, the facts that we have here, one specific instance. And I think that this is something that if it is a problem, and I don't believe it is, but that this is something that the legislature needs to address when they talk about the immunities that they have provided in 6105 and 6106. To take the EMS Act and to take the Wolfland-Wanton exception and craft it onto 6105 and 6106 is exactly what the separation of power says we're not supposed to do. So your position basically is this isn't the typical situation. The situation that the immunity is trying to protect is somebody coming in where there's somebody there who is perfectly fine, for example, and they don't engage in anything and they just leave and say everything's okay and then later are sued. I cannot imagine another scenario like this where something like that would happen. But you're saying even in this scenario, which by your own admission is the one-in-a-lifetime occurrence, at least allegation-wise, that even with these facts there still is no duty, because it would still fall within the immunities. Absolutely there are cases in which it's a very heartbreaking set of facts, but the immunity applies. Thank you, Mr. Pagano. Rebuttal, Ms. Schwartz. The immunity that is found in the EMS Act is a limited immunity which shields the provider, if they do what they're required to do under the Act, from liability unless they are willful and wanton. Under the Tort Immunity Act, if they do nothing, they're given absolute immunity. If we choose to read the Emergency Medical Services Act, which was developed for a very specific purpose to apply only to those emergency care providers that are providing this specialized prehospital care and state that they don't have to do anything, what incentive is there for any paramedic other than whatever moral obligations they may have, whatever they bring to their job, which I believe they do as care providers, to do anything? Because once they begin to treat their subject, it can be questioned whether or not they're liable. If they do nothing, they're never in a lawsuit for any reason whatsoever. I don't think that's how we look at things, and I don't think that's what the legislature was looking to correct. And in their legislative intent in setting forth a comprehensive system to coordinate all of this prehospital care to deal with these situations where a medical condition which requires urgent treatment will be met and responded to by personnel that are licensed and qualified to address those issues so that they can stabilize the patient to get them to the hospital where the definitive treatment can be rendered. I think in essence that's really what the plaintiff's point is here. What point is there for the legislature to have said, set up a very comprehensive statewide system to provide minimum emergency care, provide standing operating procedures and standing medical orders to deal with the common everyday variety garden things that you will encounter, but you don't have to follow them if you're called and you're asked to treat. It just doesn't make any sense. I believe, and I think that the reasoning that this Court invoked in the Moore case when they looked at the Domestic Violence Act, that some of those same principles apply here. That this is a very comprehensive, self-sufficient set of regulations. That this is a piece of omnibus legislation that was developed to address, again, only one very small part of the health care delivery system, that emergency care that is provided by the emergency care providers who are called for this pre-hospital transport. There is, I certainly think that it's unquestionable that the Emergency Medical Systems Act is more specific in terms of what it addresses than the Tort Immunity Act, which deals with all health care providers, not just this small group. It certainly is later in time in that the Tort Immunity Act was enacted in 1965. This legislation, the EMS Act, was first introduced in 1980, and this immunity was again amended in 2002. I think that all of these things together work that it would be to pervert every purpose within the act to state that a care provider would be allowed to come to the house and do nothing. And for those reasons, I mean, again. You mentioned the Moore case, which involved the domestic violence. Yes, Your Honor. Would you agree that a duty was spelled out, at least in clearer terms, in the Domestic Violence Act and in this act? Specifically because the legislature went so far in the preamble to also address that there had been abuses of the domestic violence system, and they, yes, that they spelled them out. Are they as explicit in the EMS Act? No. But I certainly believe that they can be implied, and that using that same type of reasoning, however, that this Court can look to what was being looked to address, and even though all of the immunities in the Tort Immunity Act apply to those actors acting under the Domestic Violence Act, that these same emergency care providers are operating within their own very small sphere in the universe of health care providers. And for those reasons, we would ask this Court to reverse the decision of the appellate court and the trial court and to remand this for further proceedings. Thank you, Ms. Schwartz. Thank you, Mr. Cajoa. Case number 104-935, Joanne Abruzzo v. The City of Park Ridge, is taken under advisement as agenda number nine.